898 P.2d 982

STATE of Arizona, Appellee,

v.

Leo G. SALAZAR, III, Appellant.

Nos. 1 CA–CR 93–0412, 1 CA–CR 93–0413.

Court of Appeals of Arizona,
Division 1, Department B.

June 13, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Div., and Ronald L. Crismon, Asst. Atty. Gen., Phoenix, for appellee.

Edelman and Martin by Donna Lyn Miers, Lakeside, for appellant.

## OPINION

LANKFORD, Presiding Judge.

In consolidated appeals, Leo G. Salazar III ("defendant") challenges his convictions and sentences for second-degree murder in 1 CA–CR 93–412 and for possession of marijuana and possession of drug paraphernalia in 1 CA–CR 93–413. We find reversible error in the denial of defendant's motion to disqualify the trial judge and in an order precluding defendant from inquiring about the juvenile probation status of two witnesses for the State.

We view the facts at trial in the light most favorable to sustaining the jury verdicts, re-

solving all reasonable inferences against the defendant. *State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

On March 24, 1992, D.M. travelled from Mesa to Winslow with his roommate, Jesus Quintana. D.M. brought along a .22 caliber pistol he had recently acquired. The following day, while target shooting, D.M. and Quintana met several other persons, including the defendant.

The group decided to drive to Holbrook in D.M.'s car. Quintana brought along approximately one pound of marijuana. When they arrived in Holbrook, defendant said he was able to sell some of the marijuana. They visited a house where defendant arranged a sale of a bag of marijuana.

Later in the evening, D.M., Quintana, and defendant decided to visit the home of an acquaintance, Mike Vigil. At Vigil's apartment, defendant, Vigil and Quintana played a drinking game and consumed large amounts of beer and tequila. A scuffle broke out between Quintana and Vigil. Defendant intervened to stop the altercation and told Vigil that he wasn't afraid to fight him.

Vigil went outside the apartment. D.M. told defendant and Quintana that he wanted to leave and they left the apartment as well. Outside, Vigil pushed Quintana, who responded by tackling Vigil. According to D.M., although Quintana seemed to be in control of the fight, defendant approached Vigil with a broken glass bottle and told him to leave Quintana alone. Defendant then went to D.M.'s car, where D.M. was seated, and asked for the pistol. D.M. handed defendant the weapon, then saw him fire "two shots, straight out."

Quintana and Vigil got up and Vigil walked toward defendant. According to D.M., Vigil had nothing in his hands. D.M.'s view of the two men was blocked, but he heard two shots, then heard Vigil say. "Leo, what are you doing to me?" D.M. then heard two more shots. Defendant got into D.M.'s car and, in reference to Quintana, stated "Nobody fucks with my primo [cousin]." D.M. drove defendant and Quintana to Winslow,

where they spent the night. Defendant and Quintana told D.M. that they intended to flee to Mexico. The day after the shooting, D.M., Quintana and defendant were stopped by police outside Payson and arrested without incident. From D.M.'s car, police recovered the .22 caliber handgun and slightly more than one pound of marijuana.

A medical examiner testified that Vigil suffered two bullet wounds that "would have been fatal alone." One bullet entered Vigil's breast bone, penetrated his heart, then lodged there. Another bullet entered Vigil's right lower back and passed through his kidney and liver. Vigil also suffered two non-fatal gunshot wounds. One shot passed through his right arm, near the elbow, then entered his lower back, lodging near his spine. The other shot caused a superficial injury to the front of his arm. The medical examiner was able to offer no opinion regarding the order in which the wounds were inflicted.

Defendant was indicted for second-degree murder and Quintana was indicted for hindering prosecution in Navajo County cause number 92–CR–156. Defendant also was indicted for possession of drug paraphernalia, possession of marijuana for sale, and transportation of marijuana for sale in Navajo County cause number 92–CR–161. D.M. was also indicted for possession of drug paraphernalia, possession of marijuana for sale, transportation of marijuana for sale, and hindering prosecution. However, prior to trial, D.M. entered a plea agreement to transportation of marijuana for sale and agreed to testify truthfully at trial. The indictments against defendant and Quintana were consolidated and they were tried jointly.

At trial, defendant asserted that he shot Vigil in self-defense. Defendant testified that, at the time of the shooting, he walked with a cane as the result of multiple fractures suffered in a motorcycle accident. When he intervened in Vigil's initial scuffle with Salazar inside the apartment, defendant said, Vigil threatened to "fuck [defendant's] crippled ass up." Defendant testified that, while Quintana and Vigil wrestled outside the apartment, he took D.M.'s pistol and fired two shots in the air. At that point, defen-

dant testified, Vigil advanced at him, looking "mad." Because of Vigil's threat several minutes earlier, defendant said he feared that Vigil would try to break his leg or take the gun from his hand. He said he also feared Vigil because Vigil had injured him in a fight several years earlier and because he heard that Vigil had beaten or shot other persons. Defendant said that he shot Vigil when he lunged at him. He recalled firing only one shot.

The jury found defendant guilty of second-degree murder, a class 1 felony, possession of drug paraphernalia, a class 6 felony, and possession of marijuana weighing less than one pound, a class 6 felony. The trial judge sentenced defendant to concurrent presumptive prison terms of 15 years for second-degree murder and 1.5 years for each of the other two charges. Defendant filed timely notices of appeal. He asserts the following:

1. His motion to disqualify the trial judge was erroneously denied;

2. The court erred in precluding inquiry regarding the juvenile probationary status of two witnesses for the State;

3. The court erred in precluding testimony from an expert witness regarding self-defense;

4. The court erred in denying his motion to sever his trial from Quintana's; and

5. The court erred in admitting evidence of a prior bad act.

### I.

We first consider whether the court erred in denying the motion to disqualify. After defendant's case was assigned to Judge Bret Huggins, defendant's counsel, David Martin, undertook representation of Judge Huggins' former secretary in a wrongful termination action against the judge. After the civil summons and complaint were served on Judge Huggins in December 1992, Martin filed a motion in this case to disqualify Judge Huggins for cause. The motion to disqualify was referred to a visiting judge, Judge Marilyn Riddel, for determination.

At a hearing, defendant argued that Huggins' disqualification was required under former Canon 3, Code of Judicial Conduct, Rule 81, Rules of the Arizona Supreme Court. The State did not oppose disqualification of Judge Huggins. Judge Riddel denied the motion.[1] Judge Huggins presided at trial. On appeal, defendant argues that Judge Riddel erred in denying the motion to disqualify Judge Huggins.

■ Initially, we reject the State's contention that this issue was waived because defendant did not challenge Judge Riddel's ruling by way of special action. The State offers no direct support for its argument, and the authority we have found is to the contrary. *See* W. Kobylak, *Review of Federal Judge's Grant or Denial of Motion to Recuse*, 64 A.L.R.Fed. 433, 444 n. 22 (1983 and Supp.1994) (noting that federal court appellate review of disqualification decision is "an established rule"); *People v. Mackey*, 175 A.D.2d 346, 347–48, 572 N.Y.S.2d 424, 426 (1991) (rejecting claim that failure to pursue interlocutory challenge to disqualification order waived issue on appeal from conviction).

The State asserts that limiting a defendant to relief by special action is required by analogy to *Atwood*, in which our supreme court stated that issues affecting a grand jury's charging decision were beyond review on appeal. 171 Ariz. at 601, 832 P.2d at 618. However, *Atwood* makes clear that this result is mandated by the fact that a trial jury's guilty verdict necessarily renders any defect in the grand jury process harmless. *Id.* A far different issue is presented by a claim regarding judicial disqualification. An error in deciding that claim may cast doubt on the integrity of the fact-finding process at trial, and is certainly not harmless as a matter of course. We conclude that this claim is preserved for appeal.

■ A party seeking a judge's disqualification must prove the grounds for disqualification by a preponderance of the evidence. *See State v. Carver*, 160 Ariz. 167, 172, 771 P.2d 1382, 1387 (1989). This Court will not

---

1. We note that disqualification of the judge is not necessarily the sole remedy. Under appropriate circumstances, disqualification of counsel might be permissible. *See People v. Mackey*, 175 A.D.2d 346, 572 N.Y.S.2d 424 (1991) (affirming order disqualifying counsel).

overturn a trial court's ruling on a motion for change of judge for cause absent an abuse of discretion. *State v. Perkins,* 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984).

■ Judge Riddel abused her discretion in denying a motion to disqualify Judge Huggins from presiding over a trial in which Martin was participating. "Even where there is no actual bias, justice must appear fair." *McElhanon v. Hing,* 151 Ariz. 403, 411, 728 P.2d 273, 281 (1986), *cert. denied* 481 U.S. 1030, 107 S.Ct. 1956, 95 L.Ed.2d 529 (1987). Two provisions of the Code of Judicial Conduct in effect at the time of defendant's trial cast light on the issue: former Canon 3(C), which addresses a judge's disqualification from a proceeding in which his impartiality may reasonably be questioned, and former Canon 2, which obligates judges to avoid the appearance of impropriety and conduct themselves in a manner that promotes public confidence in the integrity and impartiality of the judiciary.[2]

The Judicial Ethics Advisory Committee of the State of Washington considered a similar situation. The committee opined that a court commissioner involved in a personal lawsuit may hear only agreed matters in which the opposing attorney in the personal suit is counsel. Opinion 89–13 (June 15, 1989). Moreover, an informal American Bar Association ethics opinion, addressing an analogous issue under parallel provisions of the Model Code of Judicial Conduct, is persuasive. In that opinion, the committee determined that a judge was required to recuse himself from all cases in which a litigant was represented by the judge's own attorney, or by that attorney's firm. The committee stated:

> Canon 3C(1) of the Model Code sets forth instances in which a judge should disqualify himself. These are but examples, and the general standard is not limited to them. Any circumstances that objectively lead to the conclusion that the judge's impartiality might reasonably be questioned calls for disqualification. This objective standard extends beyond the judge's personal belief that his impartiality is not impaired.... *Only in unusual circumstances would a judge's impartiality not be subject to reasonable question when a lawyer appearing before the judge in behalf of a client is at the same time representing the judge in litigation pending before another court, whether the lawyer is representing the judge in a personal matter or in a matter pertaining to the judge's official position or conduct.*

ABA Committee on Ethics and Professional Responsibility, Informal Op. 1477 (1981) (citation omitted, emphasis added).

Various courts also have held that trial judges were disqualified from presiding over litigation in which a party was represented by a lawyer who was then representing the judge in another matter, *see Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1110–12 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *Texaco, Inc. v. Chandler,* 354 F.2d 655 (10th Cir. 1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1066, 15 L.Ed.2d 853 (1966), or who had recently done so. *See Rapp v. Van Dusen,* 350 F.2d 806 (3d.Cir.1965); *Smith v. Sikorsky Aircraft,* 420 F.Supp. 661, 662 (C.D.Cal. 1976). *But cf. Ex parte Cotton,* 638 So.2d 870 (Ala.1994) (even though judge had been defendant in action maintained by lawyer for a party, recusal was unwarranted because that case was no longer pending). Just as a lawyer's representation of the judge in an unrelated matter raises the possibility of favoritism, a lawyer's representation of a party adverse to the judge suggests that the judge might disfavor that lawyer, to the detriment of his client. In either case, the judge's impartiality "might reasonably be questioned."

---

2. At the time of defendant's trial, Canon 3(C) provided, in pertinent part:

> (1) A judge should disqualify himself in a proceeding in which his impartiality may reasonably be questioned, ...

Canon 2(A) provided:

> A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

In the current version of Rule 81, effective September 1, 1993, the word "should" in each of these canons has been replaced with the word "shall."

Although we do not conclude that the judge was actually biased against defendant or defense counsel, that is immaterial. The judge should have been disqualified based on the appearance of partiality.

■ Reversal of the conviction is not the inevitable consequence of finding that the judge should not have presided over the case. We recognize that the erroneous denial of a motion to disqualify a judge may be harmless. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 862, 108 S.Ct. 2194, 2203–04, 100 L.Ed.2d 855 (1982).[3]

■ However, we believe that the error was reversible under the circumstances of this case. Whether a judgment should be vacated based on the failure to disqualify the judge depends on: (1) the risk of injustice to the parties; (2) the risk that denial of relief will result in injustice in other cases; and (3) the risk of undermining public confidence in the judicial process. *Liljeberg*, 486 U.S. at 864, 108 S.Ct. at 2204–05.[4]

Although these factors do not weigh overwhelmingly in favor of reversal, on balance they warrant relief. Judge Huggins presided over a jury trial of the defendant and made several important rulings against the defendant, one of which we find to be reversible error. Although in every trial a party must expect to suffer at least some adverse rulings by the judge, defendant complains here not only about a few important rulings, but a much larger number of other rulings, principally evidentiary rulings, during trial. We think the risk of injustice in this case too great. As to the risk in other cases, the same difficulty will recur in other cases in which this counsel appears before Judge Huggins while counsel continues to represent a party who is prosecuting an action against the judge. And we think public confidence in the judicial process is best served by providing this defendant a new trial. Reversal is justified in these circumstances.

## II.

■ We next consider whether the trial court improperly limited cross-examination of two witnesses. Prior to trial, the State moved *in limine* to preclude defendant from impeaching two witnesses, L.B. and S.D., with evidence of juvenile adjudications of delinquency. The State relied principally upon Rule 609(d), Arizona Rules of Evidence, which makes such evidence generally inadmissible. In response to the motion, defendant argued that while the bases of the adjudications were not significant, the fact that L.B. and S.D. were on juvenile probation at the time of the shooting was highly important. Defendant contended that the fact that the witnesses were together at the time of the shooting established a violation of a term of their probation that prohibited them from having contact with each other. Defendant argued that this evidence was probative of bias because the witnesses would be inclined to testify favorably to the State in the hope of avoiding proceedings to revoke their probation. Judge Huggins granted the State's motion *in limine*.

This ruling was an abuse of discretion. The probationary status of L.B. and S.D., coupled with their presence together at the scene of the shooting, was probative of their alleged bias in favor of the State. As a result, it was a proper subject of inquiry at trial. *State v. Van Den Berg*, 164 Ariz. 192, 194–195, 791 P.2d 1075, 1077–1078 (App. 1990).

Moreover, the trial court's limitation of impeachment interfered with defendant's Sixth Amendment right of confrontation. In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court considered a trial court's order precluding

---

**3.** Although the Court's opinion in that case addressed the grant or denial of extraordinary relief from a civil judgment, the same analysis applies in this appeal from a criminal conviction. *See United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989); *Scott v. United States*, 559 A.2d 745 (D.C. 1989).

**4.** This creates a balancing test in which all three factors must be weighed together, but which does not require that all three weigh strongly in favor of reversal. *See, e.g., United States v. Kelly*, 888 F.2d at 747 ("We have no doubt that, at least under factors one and three, the district judge's abuse of discretion in failing to recuse himself from this bench trial constituted reversible error.").

defendant from eliciting the juvenile probationary status of a witness named Green. In reversing the conviction in *Davis,* the Court noted that the juvenile probation status was relevant to a theory of impeachment similar to the one at issue in this case:

> We cannot speculate as to whether the jury, as sole judge of the credibility of the witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided "a crucial link in the proof ... of [defendant's] act." ... The accuracy and truthfulness of Green's testimony were key elements in the State's case against [defendant]. *The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer, ...,* as well as of Green's possible concern that he might be a suspect in the investigation.

415 U.S. at 317–18, 94 S.Ct. at 1111 (citations omitted; emphasis added).

 Although violation of the Confrontation Clause may be harmless error, *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), we cannot conclude that this error was harmless. "The correct inquiry is whether, *assuming the damaging potential of the cross-examination were fully realized,* a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* at 684, 106 S.Ct. at 1438 (emphasis added). The State conceded below that the witnesses' testimony was important. S.D. testified that, as Vigil and Quintana wrestled on the ground, defendant pointed the gun to Vigil's head at close range and asked, "Do you think you are bad now, Vigil?" L.B. testified that, after Quintana's first scuffle with Vigil inside the house, defendant, referring to Vigil, stated, "He ain't nothing." Defendant's testimony contradicted these statements. Nevertheless, if believed by the jury, the testimony of L.B. and S.D. seriously undermined defen-

dant's claim that he shot Vigil in self-defense. We hold that the limitation on cross-examination was reversible error.

## III.

We now consider whether the trial court erroneously precluded testimony by an expert witness for the defense. The court barred the expert's opinion that there was a "90 percent" likelihood that a person inexperienced with firearms would be disarmed by an assailant if he attempted to use a weapon in self-defense.

 We review a decision to admit or exclude expert testimony for an abuse of discretion. *See State v. Mincey,* 141 Ariz. 425, 441, 687 P.2d 1180, 1196, *cert. denied,* 469 U.S. 1040, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984). We find no such abuse. In the context of a claim of justification based on self-defense, the expert testimony was relevant only to the reasonableness of defendant's belief that "deadly physical force [was] immediately necessary" to protect himself against Vigil's attempted use of such force. *See* Ariz.Rev.Stat.Ann. ("A.R.S.") § 13–405(2) (1989). We fail to see the connection between the expert's testimony, the defendant's actions and his alleged belief that deadly force was necessary. There was no evidence that defendant fired his weapon because he feared being disarmed. In fact, the expert testimony suggests that defendant's use of a weapon was unreasonable because he faced a risk of having the weapon turned against him if he attempted to use it.

 Moreover, this issue is generally not a proper subject for expert testimony because "the question of reasonableness is quintessentially a matter of applying the common sense and the community sense of the jury to a particular set of facts and, thus, it represents a community judgment." *Wells v. Smith,* 778 F.Supp. 7, 8 (D.Md.1991). Because jurors are capable of determining whether the use of force in self-defense is reasonable, expert testimony bearing on that issue is generally inadmissible. *See United States v. Rouco,* 765 F.2d 983, 995 (11th Cir.1985), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986) (precluding

expert's opinion that agent's arrest procedure could reasonably have prompted defendant to act in self-defense); *Braley v. State,* 741 P.2d 1061, 1063–1064 (Wyo.1987) (rejecting psychiatric testimony regarding stress factors that could have reasonably prompted defendant's exercise of deadly force in self-defense). The proposed testimony was not beyond the common experience of jurors and therefore would not "assist the trier of fact." *See* Ariz.R.Evid. 702; *State v. Tucker,* 165 Ariz. 340, 345–346, 798 P.2d 1349, 1354–1355 (App.1990). We find no error in the trial court's exclusion of the proffered expert testimony.

## IV.

The next issue is whether the trial court erred in denying defendant's motion to sever his trial from that of Quintana. Defendant asserted that Quintana would waive his Fifth Amendment privilege and testify for defendant if severance were granted.

Initially, we note that this issue was waived because defendant did not renew his motion to sever at the close of the evidence. *See* Rule 13.4, Arizona Rules of Criminal Procedure; *State v. Haas,* 138 Ariz. 413, 425, 675 P.2d 673, 685 (1984). In any event, the trial court did not err in denying the motion. To obtain a severance in order to obtain a co-defendant's testimony, the moving party must show that such testimony would be favorable to him. *State v. Self,* 135 Ariz. 374, 377, 661 P.2d 224, 227 (App.1983). Defendant made no such showing, arguing only that Quintana's testimony was important because he, along with defendant and D.M., were the only persons present at the time of the actual shooting. It is doubtful that Quintana's testimony would have been favorable because, following his arrest, he told police that he had no memory of the shooting due to intoxication. We find no error in denying severance.

## V.

The final question presented by defendant is whether the trial court erred in admitting evidence of prior acts and statements by defendant. At trial, a witness,

A.D., testified that she was with defendant, Quintana, D.M. and others at a Holbrook park several hours before the shooting. At that time, she saw defendant brandish D.M.'s handgun and announce that he intended to shoot at an empty bottle. According to A.D., when his companions told him to put the weapon away because a shot would attract police, defendant said, "he would shoot them [police], too."

Defendant moved to preclude that statement at trial on the ground that it was merely evidence of bad character, and therefore inadmissible under Ariz.R.Evid. 404(b). The trial court denied the motion, ruling that the statement was relevant "to the defendant's culpable mental state, state of mind and absence of mistake or accident."

Admitting the statement was error because it was irrelevant to the issues the court identified. Defendant did not contest the admissibility of evidence that he had access to D.M.'s gun and knew how to use it. Defendant's claim that he would shoot a police officer did not make it more likely than not that he intentionally or knowingly shot Vigil several hours later. Because we reverse on other grounds, we do not decide whether this error was independent reason for reversal or harmless error.

## VI.

In summary fashion, defendant asserts that eight rulings of the trial court, "not fully argued" on appeal, constitute reversible error. Due to defendant's failure to argue these issues, they are waived. *Carver,* 160 Ariz. at 175, 771 P.2d at 1390 (1989). Nevertheless, we have considered all of these rulings pursuant to our duty to review the entire record on appeal. A.R.S. § 13–4035. We find no further reversible error. Defendant's convictions and sentences are reversed and remanded to the trial court for further proceedings consistent with this decision.

EHRLICH and TOCI, JJ., concur.