2016 COA 73

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Kevin Earl DUNHAM, Defendant–Appellant.**

**Court of Appeals No. 13CA1771**

Colorado Court of Appeals, Div. III.

Announced May 19, 2016

Rehearing Denied July 21, 2016

---

Cynthia H. Coffman, Attorney General, Lisa K. Michaels, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Britta Kruse, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE WEBB

¶ 1 A jury convicted Kevin Earl Dunham of attempted second degree murder and first degree assault. He raised, and the jury was instructed on, self-defense. On appeal, he contends only that the trial court erred in prohibiting his attorney from cross-examining the victim about having been under the influence of methamphetamine on the night of the shooting that gave rise to the charges.

¶2 The constitutionality of such a limitation has not been addressed in Colorado. But cases from other jurisdictions and secondary authorities recognize that because some drugs may affect a witness's ability to perceive, whether the witness was under the influence of drugs is generally a proper subject of cross-examination.

¶3 In this case, because the evidence afforded a good faith basis to inquire into the victim's drug use, we conclude that the trial court erred in limiting cross-examination. Given the importance of the victim's testimony to the self-defense theory, we also conclude that this error violated defendant's constitutional right of confrontation. Finally, because after discounting the victim's testimony, the physical and other evidence would not have prevented a reasonable jury from concluding that the prosecution had failed to disprove self-defense, we further conclude that the error was not harmless beyond a reasonable doubt. Therefore, we reverse and remand for a new trial.

## I. Introduction

¶4 According to the prosecution's evidence, the victim went to a friend's apartment on July 7, 2012, and stayed for several hours. At about 2 a.m. on July 8, the victim decided to go home. The friend and the victim left together, so that the friend could drive the victim home.

¶5 The victim and his friend confronted or were confronted by several people in the apartment complex parking lot. Many details of what happened next were disputed. By some accounts, the victim was belligerent and threatening; during at least part of the confrontation, he was holding a knife. Defendant joined the confrontation and pointed a gun at the victim and the victim's friend. After defendant shot into the air, the group dispersed. Defendant left the area, on foot and alone.

¶6 The victim testified that he went back into his friend's apartment for a few minutes and then left the area, also on foot and alone, but walking in a different direction than defendant. But their paths crossed at a nearby intersection. Defendant fired several shots at the victim. Two or three bullets struck him.

¶7 A police officer quickly responded to the scene. He found the victim lying face down in the gutter with his head pointing in the direction opposite of where two shell casings were found, about 150 feet away.[1]

¶8 The only two witnesses to the shooting—other than the victim and defendant— saw a man fire several shots and then run from the area where the shell casings were found.[2] These witnesses could not identify the shooter and apparently did not see at whom he was shooting. Another witness testified that she did not hear any shouting or threats before the gunman opened fire.

¶9 The prosecution charged defendant with attempted first degree murder (after deliberation), attempted second degree murder, first degree assault, and a crime of violence sentence enhancer. Defendant conceded that he had shot the victim but claimed that he had done so in self-defense. He did not testify, instead basing his self-defense theory on telephone calls from jail to his mother. The prosecution played recordings of these calls during its case in chief, apparently to prove identity.

¶10 The jury found defendant not guilty of attempted first degree murder but guilty of the other charges, including the sentence enhancer.

## II. Whether the Trial Court Committed Constitutional Error in Precluding Cross-Examination of the Victim About Having Been Under the Influence of Methamphetamine

### A. Preservation and Standard of Review

¶11 The Attorney General argues that we should not consider this issue be-

---

1. The police also found a shell casing in the apartment complex parking lot. It was from the same caliber of gun as had fired the bullets at the victim.

2. These witnesses were friends of the victim, a husband and wife. The victim had telephoned the husband to ask him for a ride home. The husband and wife together drove to the area where they were to pick up the victim, and while waiting for the victim, they saw the shooter.

cause defense counsel abandoned it by declining the trial court's offers to question the victim and officer outside the jury's presence. To the contrary, defense counsel made her position clear and argued it thoroughly several times. The trial court understood the defense's position and ruled definitively several times. Thus, the issue was preserved. *People v. Jacobson,* 2014 COA 149, ¶ 8, —— P.3d —— ("A defendant preserves an issue when the defendant timely requested relief at the trial on the same ground raised on appeal.") (*cert. granted* Nov. 2, 2015).

¶ 12 By objecting to the trial court's proposal to question witnesses outside of the jury's presence, defense counsel did not abandon her position that there was a sufficient evidentiary basis to allow cross-examination of the victim as to his methamphetamine use the night of the shooting. And, as discussed below, counsel's objection to the court's proposed process was well founded.

■ ¶ 13 Ordinarily, we review a defendant's preserved contention that the trial court erred in limiting cross-examination of a witness for an abuse of discretion. *See People v. Raffaelli,* 647 P.2d 230, 234 (Colo.1982); *People v. Conyac,* 2014 COA 8M, ¶ 91, 361 P.3d 1005. But where, as in this case, a defendant contends that the trial court so excessively limited his cross-examination of a witness as to violate the Confrontation Clause, *see* U.S. Const. amend. VI, we review that contention de novo. *Bernal v. People,* 44 P.3d 184, 198 (Colo.2002); *People v. Carter,* 2015 COA 24M, ¶ 28, —— P.3d ——.

### B. Additional Background

¶ 14 Following jury selection, the prosecutor asked the court to instruct defense counsel not to ask the victim whether he had used methamphetamine "on the morning of [July] 7th." The prosecutor argued that evidence of methamphetamine use was other act evidence subject to CRE 404(b), of which the defense had failed to give timely notice. He also argued the lack of evidence the victim was under the influence of methamphetamine when he was treated by medical personnel after the shooting, which, as indicated, had

occurred during the early morning hours of July 8.

¶ 15 Defense counsel responded that a police officer had written in her incident report that she had overheard the victim say to a doctor treating him for his gunshot wounds that he "was under the influence of meth, but not to tell his family." Counsel argued that while this statement was sufficient evidence to ask the victim whether he was under the influence of methamphetamine at the time of the shooting, she did not intend to ask him about past use of methamphetamine "that would not implicate his demeanor or his ability to perceive in this case." The evidence of the victim's use of methamphetamine the night of the shooting was not CRE 404(b) other act evidence, counsel argued, but res gestae evidence that also directly impeached the victim's credibility—specifically, the victim's "ability to perceive."

¶ 16 The prosecutor replied that the hospital report only said the victim had admitted to using methamphetamine the morning of July 7, many hours before the shooting, and that no drug had showed up in the victim's "blood work." Defense counsel countered that the victim had been in the hospital for several days and that methamphetamine dissipates from blood "fairly quickly." Counsel explained that she intended to ask the victim on cross-examination whether he had made the statement overheard by the officer, and that if the victim denied making the statement, she would ask the officer about it.[3]

¶ 17 The court granted the prosecutor's request. But the court expressed uncertainty about what the victim had said to the officer and whether the victim had said he had used methamphetamine the night of the shooting or the previous morning. It said there appeared to be "a dispute based on medical records," so counsel would not be allowed to mention the victim's methamphetamine use unless and until the officer testified under oath outside the jury's presence. Defense counsel objected to that procedure, arguing that the jury should determine the officer's credibility. The court was unmoved.

---

3. Counsel read the relevant portion of the officer's report into the record.

¶ 18 The next morning, before opening statements, defense counsel raised the issue again. Counsel said that she had reviewed the medical records, which did not include a "tox screen." The attorneys then focused on statements in the hospital records.

¶ 19 The records showed that when asked about recreational drug use, the victim indicated he used methamphetamine. Defense counsel conceded that those statements would not be admissible, but she asked the prosecutor to clarify where in the medical records the victim had said he had used methamphetamine the morning of July 7, as the prosecutor had represented the day before. The prosecutor pointed to a page that said: "Illicit drugs. Check. Meth. This a.m." Defense counsel pointed out that the page was dated July 8 at 4:15 a.m. The prosecutor said " '[t]his a.m.' was referring to July 7th," but defense counsel responded, "[t]here's no indication in discovery that that's the case." Defense counsel argued that cross-examining the victim as to his use of methamphetamine the night of the shooting was proper because such use could have affected his perception of the events. Counsel tendered the hospital record as part of her offer of proof.

¶ 20 The trial court declined to change its prior ruling, explaining, "I do not have enough to indicate that [the victim] was actually under the influence at the time that he gave statements to law enforcement or he would be under the influence when he would be testifying during the trial itself." The court then ruled that evidence of the victim's methamphetamine use was CRE 404(b) evidence as to which the defense had not given timely notice, and that the probative value of the evidence was outweighed by the danger of unfair prejudice.

¶ 21 But the matter did not end there. During a break in the victim's direct testimony, defense counsel again tried to change the court's mind. Counsel argued that no discovery had been produced by the prosecution

showing that the victim's blood had been screened for methamphetamine while he was in the hospital, and nothing in discovery indicated that the victim had been referring to the morning of July 7, rather than July 8, when he had said he used methamphetamine. Counsel cited *People v. Roberts*, 37 Colo.App. 490, 553 P.2d 93 (1976), as support for the proposition that evidence of a witness's drug use at the time of the events about which the witness is testifying is admissible.

¶ 22 The prosecutor continued to object that the evidence was subject to CRE 404(b). He also asserted that no reasonable person could read the reference to "[t]his a.m." in the medical records as referring to July 8 rather than July 7, and so there was no evidence that the victim was under the influence of methamphetamine at the time of the shooting.

¶ 23 After defense counsel responded to the prosecutor's arguments, emphasizing that those arguments went to the weight, not the admissibility, of the evidence, the court reaffirmed its earlier ruling. It said, "I don't know whether [the victim] was under the influence of meth and I don't know whether he was referring to being under the influence of meth" when he made the statement overheard by the officer. The court reiterated that the evidence was subject to CRE 404(b) and "unfairly prejudicial."

¶ 24 Then the court proposed questioning the victim outside the jury's presence about whether he had used methamphetamine the night of the shooting. Defense counsel objected, arguing that the evidence was sufficient to justify allowing the jurors to hear about the issue and make their own credibility determinations. The court ultimately ruled that the victim had been referring to using methamphetamine the morning of July 7.[4]

## C. Law

¶ 25 "The right of a criminal defendant to confront the witnesses against him

---

4. The court apparently based its ruling in part on the prosecutor's representation that the victim had told him the night before that he had been referring to the morning of July 7. Defense counsel argued, to no avail, that she should be al-

lowed to cross-examine the victim about that statement, and that in any event, the statement merely went to the weight of the other evidence of methamphetamine use, not its admissibility.

... is not satisfied simply by having the witnesses physically present in court, but requires that the defendant be given an opportunity for effective cross-examination." *Merritt v. People*, 842 P.2d 162, 165–66 (Colo. 1992) (citing *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). Even so, the right to cross-examination is not unlimited; the court may limit the scope and duration of cross-examination subject to well-established rules. *Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

■ ¶ 26 In limiting cross-examination, however, a court goes too far and commits constitutional error if it "limit[s] excessively a defendant's cross-examination of a witness regarding the witness' credibility, especially cross-examination concerning the witness' bias, prejudice, or motive for testifying." *Id.* at 167; *accord Vega v. People*, 893 P.2d 107, 118 (Colo.1995); *see also Krutsinger v. People*, 219 P.3d 1054, 1061 (Colo. 2009) ("Error in limiting a defendant's ability to challenge the credibility of the evidence against him, either by restricting the cross-examination of prosecution witnesses or by restricting the presentation of defense evidence, implicates 'the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." ' " (quoting *Crane v. Kentucky*, 476 U.S. 683, 690–91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986))).

■ ¶ 27 A defendant's constitutional right of confrontation may be violated not only by excessively limiting his efforts to cross-examine a witness about bias, prejudice, or motive to testify, *see Merritt*, 842 P.2d at 167, but also by excessively limiting his efforts to cross-examine a witness about any matter bearing directly on the witness's credibility. And whether the witness was, at the time of the events as to which he testifies, under the influence of some drug that could have affected his perception of those events bears directly on credibility. *E.g., United States v.*

*Robinson*, 583 F.3d 1265, 1274–76 (10th Cir. 2009) (considering witness who had been using alcohol, marijuana, opioids, benzodiazepine, Valium, Klonopin, Darvocet, and Hydrocodone); *State v. Sabog*, 117 P.3d 834, 840–45 (Haw.Ct.App.2005) (methamphetamine); *State v. Carrera*, 528 A.2d 331, 333–34 (R.I.1987) (marijuana and cocaine); *see also United States v. Fowler*, 465 F.2d 664, 665–68 (D.C.Cir.1972) (unspecified narcotics); *Doe v. State*, 487 P.2d 47, 57–58 (Alaska 1971) (LSD); *Roberts*, 37 Colo.App. at 491, 553 P.2d at 94 (heroin).[5]

### D.   Application

■ ¶ 28 The Attorney General declines to defend the trial court's CRE 404(b) ruling, and for good reason: the evidence was not other acts evidence, but rather res gestae. *See People v. Covington*, 988 P.2d 657, 663 (Colo.App.1999) (holding that evidence of the defendant's breath-alcohol level at the time of the events at issue was res gestae, not other acts evidence), *rev'd on other grounds*, 19 P.3d 15 (Colo.2001); *see also People v. Quintana*, 882 P.2d 1366, 1372–74 (Colo.1994) (discussing the distinction between other acts and res gestae evidence); *People v. Trujillo*, 2014 COA 72, ¶¶ 63–69, 338 P.3d 1039 (same).

¶ 29 This concession leaves for review only the trial court's conclusion that the evidence was insufficient to allow the jury to consider the matter. The Attorney General argues that the trial court's view of the sufficiency of the evidence was correct, and that the trial court acted properly under CRE 104(a) in making that determination. We reject both arguments, addressing them in reverse order.

#### 1.   CRE 104(a)

¶ 30 When the admissibility of evidence depends on answering a preliminary question, as in this case, CRE 104 governs the inquiry. If the relevancy of evidence de-

---

5.  Major treatises on evidence unanimously reflect the view that evidence a witness was under the influence of drugs at the time of the relevant events is admissible as impeachment because drugs may affect the witness's ability to perceive, and therefore to testify accurately. 1 *McCormick on Evidence* § 44, at 289 (Kenneth S. Broun ed., 7th ed.2013); 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:80, at 503–05 (4th ed. 2013); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 607.05[1], [3], [4][a] (Mark S. Brodin ed., 2d ed. 2015).

pends on "the application of policy considerations, such as those relating to the competency of a witness to testify, the existence of a privilege, the applicability of hearsay exceptions, or other protective policies of exclusionary rules[,]" subsection (a) applies. *People v. Garner*, 806 P.2d 366, 371 (Colo.1991). Under this subsection, the court decides the preliminary question. *Id.*; *see Burlington N. R.R. Co. v. Hood*, 802 P.2d 458, 467–68 (Colo.1990).

¶ 31 But if "the relevancy of evidence depends upon the fulfillment of a condition of fact," subsection (b) applies. CRE 104(b); *see Hood*, 802 P.2d at 468. Under this subsection, the court should admit the evidence "upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." CRE 104(b).

¶ 32 "Preliminary questions of conditional relevancy under CRE 104(b) are 'questions of probative force rather than evidentiary policy.'" *Hood*, 802 P.2d at 468 (quoting *United States v. James*, 590 F.2d 575, 579 (5th Cir.1979)); *accord Garner*, 806 P.2d at 371. "The resolution of such questions ... is within the competence of ordinary jurors...." *Hood*, 802 P.2d at 468. Thus,

> in resolving such questions the judge merely determines as a preliminary matter whether the foundation evidence is sufficient to support a reasonable finding by a jury of the fulfillment of the condition. If such a *prima facie* showing is made, the trial court admits the evidence for the jury's consideration.

*Garner*, 806 P.2d at 371 (citation omitted).

¶ 33 Importantly, in making a preliminary determination under CRE 104(b), the court "is not to evaluate and weigh the credibility of the proffered evidence but rather is to examine all the evidence from the standpoint of answering whether the jury could reasonably find by a preponderance of the evidence that the conditional fact has been established." *Hood*, 802 P.2d at 468. "Only if the proffered evidence, considered in its total context, is manifestly insufficient to sustain a reasonable finding by the jury of

the conditional fact should the trial court rule the evidence inadmissible." *Id.*

¶ 34 The relevancy of the proposed cross-examination at issue in this case—the victim's having been under the influence of methamphetamine on the night of the shooting—did not depend on any policy consideration. Rather, it depended on the fulfillment of a condition of fact—namely, that the statements attributed to the victim by the officer and the hospital records referred to his methamphetamine use on July 8. Thus, subsection (b), not subsection (a), of CRE 104 applies in determining relevancy.

### 2. Sufficiency

¶ 35 The next question, then, is whether the evidence before the court when it ruled was sufficient to have allowed a reasonable jury to find that the statements referred to methamphetamine use on July 8. We conclude that it was.

¶ 36 The statement overheard by the police officer, made at about 2:30 a.m. on July 8, was phrased such that the victim could have been referring to his present condition when he made the statement: "When [the victim] was speaking with one of the physicians, I heard him say he was under the influence of meth, but not to tell his family." In our view, that is the most natural reading of the statement. And the hospital report's statement that the victim had said he had used methamphetamine "[t]his a.m.," recorded at 4:15 a.m. on July 8, could also reasonably be understood as referring to earlier on July 8.

¶ 37 Especially considered along with the testimony that the victim was belligerent and threatening the night of the shooting, which occurred around 2 a.m. on July 8, this evidence was sufficient to support a finding by a reasonable jury by a preponderance of the evidence that the victim used methamphetamine the night of the shooting. This is so notwithstanding any contrary testimony the victim might give, which the jury would be under no obligation to credit. And although the foundational evidence may have also been susceptible of an inference that the victim was referring to the morning of July 7, that

was not the only reasonable inference and certainly not one the jury was obligated to draw.

¶ 38 Therefore, we conclude that the trial court erred in prohibiting defense counsel from cross-examining the victim about methamphetamine use the night of the shooting. In ruling to the contrary, the trial court apparently believed, in error, that it could decide the matter by determining the weight and credibility of the foundational evidence.

### 3. Constitutionality of Error

¶ 39 We further conclude that the error was constitutional.

¶ 40 The question in determining whether a restriction on cross-examination runs afoul of the constitutional right of confrontation is whether a " 'reasonable jury might have received a significantly different impression of a witness's credibility' had the court not erroneously excluded otherwise appropriate evidence." *Krutsinger*, 219 P.3d at 1061 (quoting *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431). Had the jury considered, and credited, evidence that the victim was under the influence of methamphetamine the night of the shooting, it might well have had a negative view of the victim's credibility. Many courts have recognized that evidence a witness was under the influence of drugs at the time of the events about which the witness testified bears directly on the witness's credibility because drug use may affect a person's ability to perceive accurately. *See, e.g., Robinson*, 583 F.3d at 1272; *Roberts v. Hollocher*, 664 F.2d 200, 203 (8th Cir.1981); *Carrera*, 528 A.2d at 333; *Blumhagen v. State*, 11 P.3d 889, 893 (Wyo.2000).

¶ 41 At least one court has applied that principle to methamphetamine use. *Sabog*, 117 P.3d at 841–43. The Attorney General does not argue otherwise or cite contrary authority.

¶ 42 Having concluded that the trial court committed constitutional error, we turn to whether the error requires reversal.

### III. Whether the Error Was Harmless Beyond a Reasonable Doubt

### A. Law

¶ 43 Where, as here, a trial court has violated a defendant's constitutional right of confrontation, reversal is required unless the error was harmless beyond a reasonable doubt. *Krutsinger*, 219 P.3d at 1060–61; *Merritt*, 842 P.2d at 168; *Carter*, ¶ 28; *see Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431. An error is not harmless beyond a reasonable doubt if "there is a reasonable possibility that the error might have contributed to the conviction." *People v. Carter*, 2015 COA 36, ¶ 47, — P.3d — (*cert. granted* Jan. 25, 2016).

¶ 44 The harmless beyond a reasonable doubt test implicates several factors relating to the improper limitation on cross-examination. They include "whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence on the material points of the witness' testimony, the extent of the cross-examination otherwise permitted, and the overall strength of the prosecution's case." *Merritt*, 842 P.2d at 169 (citing *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431). And the Attorney General has the burden of showing that a constitutional error was harmless beyond a reasonable doubt. *Hagos v. People*, 2012 CO 63, ¶ 11, 288 P.3d 116 (citing *Chapman v. California*, 386 U.S. 18, 24, 26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

### B. Additional Background

¶ 45 As argued by defense counsel in closing, defendant's self-defense theory began with the parking lot confrontation, during which the victim and the victim's friend had threatened several people, including defendant. The victim did so by brandishing a knife. After firing a "warning shot," defendant left the apartment complex on foot.

¶ 46 But the victim followed him. Defendant saw the victim across the street from a distance. The victim yelled something at defendant and started running toward defendant with his hand behind his back. Believing that the victim was still armed, defendant shot him.

¶ 47 Defense counsel also argued that although the police and emergency personnel did not find any weapon on the victim, the jury could infer that the victim had been armed. Specifically, counsel pointed to testimony that two of the victim's friends found him very shortly after the shooting but ran back to the apartment complex before the police arrived. A witness heard a clatter after the friends returned. Counsel theorized that the two friends could have taken a weapon from the victim and disposed of it.

### C. Application

¶ 48 With all that in mind, we turn to assessing the harmlessness factors in *Merritt*. By any fair reading of the record, the question is close.

¶ 49 First, while the victim's testimony about the confrontation in the parking lot was cumulative on some points, it was not on others. And his testimony about the circumstances of the shooting was not cumulative at all.

¶ 50 Second, some aspects of the victim's testimony were corroborated, but other aspects were not. Several witnesses testified—and defendant conceded at trial—that during the parking lot confrontation, he had shot into the air. Even so, testimony on other parts of the victim's story was contradictory. For example, witnesses differed on whether the victim ever brandished a knife.

¶ 51 Turning to the immediate circumstances surrounding the shooting, had defense counsel been allowed to cross-examine the victim on whether he was under the influence of methamphetamine, the jury might have discounted some or all of the victim's testimony about how he had been shot. *See Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431 (a reviewing court "assum[es] that the damaging potential of the cross-examination [was] fully realized" when considering whether the error was harmless beyond a reasonable doubt). Still, defendant admitted that he shot the victim. And doubt about the victim's credibility would not have tainted the physical evidence or testimony about the crime scene by police officers.

¶ 52 Starting with the medical evidence, the victim suffered a graze wound across his back, just below the skin, in two places, very close together. Because the bullet or bullets did not penetrate his body, his side had to have been facing defendant when he was hit. In contrast, the more serious buttocks wound, where the bullet lodged in the victim's intestine after having penetrated at an upward angle, indicates that he had to have been facing away from defendant, and was most likely on the ground, when hit.

¶ 53 True enough, the more serious wound is consistent with the victim's testimony that he was facing away from, not moving toward, defendant. And the police officer found the victim facing opposite the direction from which defendant had fired, again corroborating the victim's testimony that he was not moving toward defendant.

¶ 54 But the graze wound does not corroborate the victim's testimony that he was already running away when defendant shot him. It could have been suffered as the victim turned away from defendant before starting to flee. The victim admitted having taken a few steps after being hit the first time. As well, a police officer testified that the victim "wasn't bleeding very badly as compared to some gunshot wounds" the officer had seen.

¶ 55 Third, defense counsel cross-examined the victim extensively, sometimes referring to prior inconsistent statements the victim had made to the police. Even so, cross-examination into the victim's use of methamphetamine would have been at least as impeaching as any other aspect of the cross-examination.

¶ 56 Because none of these three factors is dispositive, the fourth factor becomes the most important. Under this factor, defendant's admission to having shot the victim means that the overall strength of the prosecution's case turns on the strength or weakness of the self-defense theory, which the prosecution had to disprove beyond a reasonable doubt. *See People v. Duran,* 272 P.3d 1084, 1098 (Colo.App.2011) ("[T]he prosecution must disprove beyond a reasonable doubt that the defendant acted in reasonable self-defense.").

¶ 57 Defendant did not testify. Instead, most of the evidence on his theory came from recordings of two telephone calls defendant made to his mother after he had been arrested. In those calls, defendant told his mother that he had shot the victim only after the victim had come running toward him with his hand behind his back. Because he feared the victim might be armed, he shot first.

¶ 58 To be sure, the physical evidence showed that defendant shot the victim in the back at least once, and from a considerable distance. The Attorney General emphasizes that several details of defendant's statements to his mother were contradicted by other evidence. For example,

- contrary to defendant's statement to his mother, the victim fell away from him, not toward him; and
- although defendant said that the victim had followed him, the only testimony was that the victim went back into his friend's apartment before leaving the apartment complex, and he departed in a different direction than defendant.

¶ 59 As well, other statements defendant made to his mother in the telephone calls undermined self-defense. For example,

- defendant repeatedly denied having shot the victim in the back, saying he would never do such a thing and that anyone who said he had shot the victim in the back was lying; and
- he admitted to having disposed of his gun right after the shooting.

¶ 60 The prosecution also introduced a recording of defendant's interrogation by the police. During that interrogation, defendant first denied being involved in the shooting or even owning a gun.

¶ 61 Yet, however tattered defendant's credibility may have been when the case went to the jury, in weighing the evidence for purposes of determining harmlessness beyond a reasonable doubt, an appellate court should not make credibility determinations. *See State v. Johnson,* 54 S.W.3d 598, 605 (Mo.Ct.App.2001) ("This is not a case where the evidence is such that we can say, without making a credibility determination reserved for the factfinder, that the evidence of guilt

of murder was overwhelming and therefore the error was immaterial. There were issues here for the jury's resolution under proper instruction."). Rather, we recognize that "a jury is free to believe only part of a witness's testimony." *People v. Johnson,* 2016 COA 15, ¶ 47, 381 P.3d 348 (citing *People v. Mendoza–Balderama,* 981 P.2d 150, 157–58 (Colo. 1999)). And unlike the victim, the record does not indicate that defendant was under the influence of drugs at the time.

¶ 62 In this case, weighing credibility would be especially problematic because self-defense often involves conflicting evidence and frequently turns on competing inferences. *See, e.g., Commonwealth v. Toon,* 55 Mass.App.Ct. 642, 773 N.E.2d 993, 1003 (2002) ("Without direct evidence as to the defendant's actual belief that he was in imminent danger of death or serious bodily harm from which he could only extricate himself by using deadly force, evidence as to the right to use deadly force in self-defense depended entirely upon inference from circumstantial evidence."); *see also Gray v. United States,* 589 A.2d 912, 917 (D.C.1991) (a defendant may rely on circumstantial evidence to establish self-defense); *Dubose v. State,* 187 Ga. App. 293, 369 S.E.2d 924, 926 (1988) ("Each element of the prima facie case [of self-defense] may be established by the testimony of other witnesses or by circumstantial evidence."); *State v. Schaefer,* 170 W.Va. 649, 295 S.E.2d 814, 818 (1982) ("The question of self-defense in this case depended upon inferences to be drawn from the proven facts.").

¶ 63 Particularly under such circumstances, caution should be exercised in weighing the evidence to cure a constitutional error rather than reversing for retrial. *See, e.g., United States v. Guyon,* 717 F.2d 1536, 1548 (6th Cir.1983) ("The Supreme Court itself admonished against giving undue weight to even overwhelming evidence of guilt, stating that errors affecting the substantial rights of defendants cannot be considered harmless." (citing *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969))); *Commonwealth v. Rasheed,* 536 Pa. 567, 640 A.2d 896, 898 (1994) ("[A] conclusion that the properly admitted evidence is 'so overwhelming' and the

prejudicial effect of the ... error is 'so insignificant' by comparison, that it is clear beyond a reasonable doubt that the error is harmless, is not to be arrived at lightly.") (citation omitted).

¶ 64 This is so because "the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment ... infringe[s] upon the jury's factfinding role and affect[s] the jury's deliberative process in ways that are, strictly speaking, not readily calculable." *Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Nor is the classic formulation for applying the harmless beyond a reasonable doubt test to improperly *admitted* evidence—*see, e.g., People v. Frye,* 2014 COA 141, ¶ 15, 356 P.3d 1000 (considering whether the improperly admitted evidence contributed to the verdict, not whether the same verdict would probably have resulted regardless of the tainted evidence)—as easy to apply where evidence has been improperly *excluded.*

¶ 65 Given all this, we recognize a reasonable possibility that the erroneous limitation on cross-examination of the victim having been under the influence of methamphetamine on the night of the shooting contributed to the convictions. *See, e.g., State v. Salazar,* 182 Ariz. 604, 898 P.2d 982, 988 (Ariz.Ct.App.1995) (explaining that limiting defendant's impeachment of two witnesses was not harmless where, "if believed by the jury, the testimony of [the witnesses] seriously undermined the defendant's claim that he shot [the victim] in self-defense").

¶ 66 Specifically, had this cross-examination been allowed, the jury might have:

- rejected *all* of the victim's testimony about how he was shot;
- accepted defendant's statements to his mother that the victim was coming toward him, with his hand behind his back, when defendant started firing;
- discounted defendant's insistence that he would never shoot someone in the back,

given that he was speaking to his mother;

- considered that defendant admitted having fired more shots than hit the victim; and
- reconciled the multiple shots and different angles of the wounds by concluding that the victim was coming toward defendant, turned to flee when he heard the first shot, suffered the graze wound from the second or third shot as he was turning, fell shortly thereafter, and then suffered the buttocks wound from the final shot.[6]

## IV. Conclusion

¶ 67 The judgment of conviction is reversed, and the case is remanded for a new trial on the charges for which defendant was convicted.

JUDGE BOORAS concurs.

JUDGE J. JONES concurs in part and dissents in part.

JUDGE J. JONES, concurring in part and dissenting in part.

¶ 68 I concur in the majority's determination that the district court erred in barring defense counsel from asking the victim about whether he had used methamphetamine in the hours before the shooting. And I agree with the majority that the error was of constitutional magnitude. I part company with the majority, however, on whether the error was harmless beyond a reasonable doubt. In my view, it was.

¶ 69 The majority articulates correctly the factors we should consider in determining whether a confrontation error is harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Merritt v. People,* 842 P.2d 162, 169 (Colo.1992). I agree with the majority's assessment of the first factor—the extent to which the victim's testimony was cumulative. But I agree only somewhat with the majority's assessment of

6. In so concluding, we do not suggest that the self-defense theory is particularly strong, much less compelling. We conclude only that the Attorney General has failed to meet her "heavy burden," *People v. Mendenhall,* 2015 COA 107M, ¶ 49, 363 P.3d 758, of showing the constitutional error to have been harmless beyond a reasonable doubt.

the second factor—the extent to which the victim's testimony was corroborated or contradicted by other evidence: the majority understates the extent to which the victim's testimony about the circumstances of the shooting itself was corroborated by other evidence. I agree largely with the majority's assessment of the third factor—the extent of cross-examination otherwise permitted. But the majority's assessment of the fourth factor—the overall strength of the prosecution's case—overstates the viability of defendant's self-defense theory given defendant's articulation of that theory and the uncontroverted forensic and other evidence.

¶ 70 *Factor two* : The victim testified that he first saw defendant after the initial confrontation when he was crossing a nearby street, immediately after ending a cell phone call. He stopped in the middle of the street and saw defendant over his left shoulder, standing at the corner of an intersection. Defendant then opened fire. The victim denied that he was moving toward defendant, or even facing him, when defendant began shooting.

¶ 71 The victim's testimony about his location vis-à-vis defendant was corroborated by the combination of (1) evidence of the location of the shell casings; (2) two witnesses' testimony as to where the shooter had fired from; (3) evidence of the location of the path the victim had traveled to get to the street; and (4) evidence of the location where the victim fell after being shot.

¶ 72 Given the victim's location when defendant began shooting, his testimony that he was not facing defendant was corroborated. The victim's location in the street put him at an angle in relation to defendant such that had defendant then shot at him, the victim could have suffered the across-the-back wound.

¶ 73 The victim's testimony that he was not moving toward the victim is corroborated by other evidence. It is undisputed that two shots struck the victim from behind, in the back and buttocks. And, though the police searched for blood between the point from which defendant fired and the point where the victim fell to the ground, they found none. The victim fell facing away from, not toward, defendant.

¶ 74 *Factor three* : The majority acknowledges that the record shows that defense counsel cross-examined the victim extensively. Counsel persistently tried to poke holes in the victim's account, sometimes referring to statements the victim had previously made to the police. The court did not bar any area of cross-examination except the victim's use of methamphetamine.

¶ 75 *Factor four* : Lastly, the evidence of self-defense—the issue on which the case turned—was extremely weak. As the majority notes, defendant's self-defense theory was based almost entirely on recordings of two telephone calls defendant made to his mother after he had been arrested. In those calls, defendant told his mother that the victim had followed him, and that he had shot the victim only because the victim had come running toward him with his hand behind his back. He thought the victim might be armed, so he shot first.

¶ 76 The following evidence refuted defendant's theory:

- He had fired a shot into the air in the apartment complex parking lot.
- In light of the victim's location when he was shot, defendant's location when he pulled the trigger, the geography of the area (shown by numerous photos and photographic maps introduced into evidence), and testimony by a witness who saw the victim leave the apartment complex via the canal path, the victim did not follow defendant, who left the complex on a different route.[1]
- Defendant repeatedly denied to his mother that he had shot the victim in the back, saying he would never do such a thing and that anyone who said he shot the victim in the back was lying. But the only shots that struck the victim struck him from behind, in the back and buttocks.

---

1. The witness who saw the victim leave the apartment complex did not know the victim. At trial, defense counsel conceded that the victim left the complex via the canal path, which was a different route from that taken by defendant.

- Contrary to defendant's statements to his mother, the victim fell away from him, not toward him.
- The victim fell 150 feet from, and facing away from, where defendant had fired.
- The trajectory of the bullet that struck the victim in the buttocks, lodging in the victim's intestines, showed that the bullet had struck the victim when he was falling to or already on the ground.
- As noted, the police did not find any blood between where defendant fired and where the victim fell.
- Defendant fled the scene and (according to his own statements) disposed of his gun right after the shooting—actions consistent with consciousness of guilt, not self-defense.
- When questioned by police, defendant persistently denied being involved in the shooting or ever owning a gun; these statements also demonstrate consciousness of guilt.

¶ 77 The jury was allowed to consider self-defense only because of the recorded phone calls. But the version of self-defense articulated by defendant in those phone calls was refuted by the evidence. The majority's conclusion that, despite much of the evidence noted above, the jury could reasonably have found that defendant shot the victim in self-defense is based on what I think is a counterintuitive proposition—that the jury could have so found despite disbelieving that theory as defendant himself articulated it.

¶ 78 I recognize that the People have a high burden of showing that the error was harmless beyond a reasonable doubt. But my review of the record leads me to conclude that there is no real-world possibility that the jury would have credited defendant's self-defense theory had the court allowed his counsel to ask the victim whether he had used methamphetamine the night of the shooting. Though we should be hesitant to find a confrontation error harmless, such a conclusion may be warranted in a given case in light of the record. *See, e.g., People v. Houser,* 2013 COA 11, ¶¶ 58–71, 337 P.3d 1238 (confrontation error in disallowing cross-examination regarding terms of victim-witness's plea agreement was harmless be-

yond a reasonable doubt in light of the "overall strength of the prosecution's case"); *cf. People v. Miller,* 113 P.3d 743, 751–52 (Colo. 2005) (instructional error not reversible because, in part, the defendant's claim of self-defense was contradicted by forensic evidence); *People v. Bell,* 809 P.2d 1026, 1029–31 (Colo.App.1990) (violation of the defendant's right to present a defense was harmless beyond a reasonable doubt because, in part, extensive cross-examination on the relevant issue was allowed and the evidence of guilt was overwhelming). I believe such a conclusion is warranted in this case, and therefore I would affirm defendant's convictions.